**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**NATIONAL TRUST FOR HISTORIC**                    **CIVIL ACTION**
**PRESERVATION IN THE UNITED STATES**

**VERSUS**                                                    **NO. 09-5460**

**UNITED STATES DEPARTMENT**                       **SECTION "L" (2)**
**OF VETERANS AFFAIRS, ET AL.**

## ORDER & REASONS

Before the Court are the following motions:

(1) Plaintiff National Trust for Historic Preservation in the United States' Motion for

Summary Judgment (Rec. Doc. No. 58),

(2) Defendants Department of Veterans Affairs, General Eric Shinseki in his official

capacity, the Federal Emergency Management Agency, and Craig Fugate in his official

capacity's Cross-Motion for Summary Judgment (Rec. Doc. No. 103),

(3) Intervenor-Defendant, Louisiana Division of Administration, Office of Facility

Planning and Control's Cross-Motion for Summary Judgment (Rec. Doc. No. 97), and

(4) Intervenor-Defendant, City of New Orleans' Cross-Motion for Summary Judgment

(Rec. Doc. No. 108).

For the following reasons, Plaintiff's Motion for Summary Judgment (Rec. Doc. No. 58)

is DENIED, and the Defendants and Intervenor-Defendants' Cross-Motions (Rec. Doc. Nos. 97,

103, 108) are GRANTED.

## TABLE OF CONTENTS

I.      Background....................................................................................................................3

II.     Law & Analysis.............................................................................................................7

A.   National Environmental Policy Act...................................................................8

B.   Standard of Review..........................................................................................9

C.   Arguments of the Parties.................................................................................10

    1.   Ripeness of Plaintiff's Claims Against FEMA...........................................11

    2.   Plaintiff's Standing....................................................................................12

    3.   Equitable Doctrine of Laches...................................................................15

    4.   NEPA Challenges to the PEA & FONSIs..................................................16

        a.   Segmentation..........................................................................17

        b.   Consideration of Impacts........................................................19

            i.   Noise........................................................................21

            ii.   Traffic.......................................................................23

            iii.   Drainage & Flooding................................................25

            iv.   Contamination.........................................................27

            v.   Land Use & Socioeconomics....................................30

        c.   Tiering....................................................................................37

        d.   Mitigation Measures...............................................................43

            i.   Drainage & Flooding................................................44

            ii.   Land Use..................................................................47

            iii.   Historic Buildings....................................................50

            iv.   Socioeconomic Effects.............................................53

            v.   Businesses................................................................56

III.   Conclusion..........................................................................................................57

## I.      BACKGROUND

The present matter arises out of a challenge under the National Environmental Policy Act ("NEPA") to a Programmatic Environmental Assessment ("PEA") and subsequent Findings of No Significant Impact ("FONSIs") issued by the Federal Emergency Management Agency ("FEMA") and the U.S. Department of Veterans Affairs ("VA"), regarding the selection of the Mid-City site for building medical facilities to replace Charity Hospital and the Veterans Affairs Medical Center ("VAMC").  At the center of this case are the future locations of two medical facilities in New Orleans, Louisiana.  The first is Charity Hospital, presently located at 1532 Tulane Avenue, which is one of two major facilities which comprise the Medical Center of Louisiana at New Orleans ("MCLNO").  MCLNO consists of a group of hospitals, clinics, and support facilities tasked with serving a dual mission as healthcare provider for the indigent, uninsured, and underinsured in the New Orleans area, while simultaneously serving to train the future doctors, nurses, and allied health professionals from several local colleges and universities.  The second medical facility is the VAMC, presently located at 1601 Perdido Street, near Charity Hospital, established to provide medical care to veterans throughout southeast Louisiana and to serve as a teaching and research hospital.  On August 29, 2005, the City of New Orleans experienced a national disaster as a result of the violent storm waters, winds, and flooding caused by Hurricane Katrina.  Charity Hospital and the VAMC sustained substantial flood damage as a result of the breach of the levee system.  Both buildings are presently closed and remain in their post-Katrina state of disrepair.

The Louisiana Division of Administration, Office of Facility Planning and Control ("State"), is Louisiana's governmental office which oversees the construction and maintenance of all state-owned buildings and facilities.  Following Hurricane Katrina, the State began

working to implement a business plan to replace charitable health care services and training with the Louisiana State University Medical Center ("LSUMC"), a state-of-the-art, modern academic medical center to restore healthcare services and training.  The State applied to FEMA for public funds for permanent repairs to all damaged state facilities and buildings necessitated by Hurricane Katrina, one of the buildings included in this request was Charity Hospital.  The State and FEMA were in disagreement as to the proper amount of public  funds needed to restore the healthcare services and training once provided by Charity Hospital and they entered into arbitration on the matter in order to resolve the dispute.  On January 27, 2010, the Civilian Board of Contract Appeals awarded the State $474.4 million in compensation for damage to the facility.  The State's plan to restore the services previously provided by Charity will utilize these FEMA Public Assistance funds for a portion of the costs of the replacement facility.

At the same time, the VA faced the task of determining the fate of its own facility which was also badly damaged by Hurricane Katrina.  It decided to relocate its facility rather than attempt to restore the current building.  The City was brought in as a Responsible Entity, charged with land acquisition responsibilities for the new location of the current VAMC.  The Department of Housing and Urban Development ("HUD") allocated $75,000,000 to the City to carry out these responsibilities.   The City was further authorized to act as the federal agency in lieu of HUD for compliance with environmental and historic preservation requirements for the new VAMC location.

Since Charity Hospital and the VAMC have historically operated in proximity to each other and served as a common training resource for medical students and doctors, the VA, FEMA, the State and the City expressed an interest in considering locating the LSUMC facility adjacent to the VA facility to maximize operational efficiencies.

Page 4

Since FEMA and the VA are both federal agencies involved in the LSUMC and VAMC projects, it is necessary for them to comply with NEPA and the National Historic Preservation Act ("NHPA"), and the regulations implementing these laws, in planning the medical facilities projects. FEMA, the VA, the State and the City agreed to conduct environmental and cultural resource reviews for both projects, as required by NEPA and NHPA. After consulting the President's Council on Environmental Quality ("CEQ"), the agencies and entities decided to complete a joint, tiered NEPA analysis consisting of a Programmatic Environmental Assessment ("PEA") and a subsequent site-specific assessment. This involved first evaluating site selection, acquisition and site preparation (Tier 1) and then, second, evaluating design, construction and operation after the respective sites were selected (Tier 2).

The VA and FEMA were designated as co-lead agencies for conducting the PEA. The State and City were designated Cooperating Agencies. A website was established for the public to monitor their progress. Public meetings were held in New Orleans on June 26, July 17, and August 11, 2008. A draft PEA on site selection for the two hospitals was released and made available for a thirty day public comment period on October 16, 2008.

Following the public comment period, the PEA was finalized and made public on November 21, 2008. The PEA focused on identifying and evaluating those impacts currently ripe for review, while also identifying specific topics that will need further in-depth analyses. The PEA identified and discussed three different potential sites for the new VAMC, (1) the Mid-City site, (2) the Lindy Boggs site, and (3) the Ochsner site, and two different potential sites for the LSUMC, (1) the Mid-City site and (2) the current Charity Hospital site. The PEA also considered potential impacts of the various locations to the following: physical environment; water and coastal resources; land use; infrastructure and utilities; cultural resources, including

Page 5

historic buildings; socioeconomics; transportation; human health and safety; biological resources; air quality; and noise and vibrations.  It additionally discusses potential cumulative impacts, and mitigation that would be used to avoid any significant impact.  There is also a discussion of the historic buildings and Mid-City's Historic District, of which 4% of the preferred Mid-City site location will overlap.

The LSUMC and the new VAMC's potential effects on the historic properties and districts also triggered the agencies and entities' obligations under Section 106 of the NHPA. Accordingly, the VA, FEMA, City, and State drafted and executed a Programmatic Agreement (PA) pursuant to the NHPA which sets forth stipulations for avoiding, minimizing, or mitigating adverse effects under each of the site selection alternatives.  The PA was signed by the VA, FEMA, the City, the State's Historic Preservation Officer and Division of Administration.

Based upon the assessments conducted pursuant to NEPA and the NHPA, the Mid-City location emerged as the favored site for both facilities.  On November 24, 2008, both FEMA and VA issued Findings of No Significant Impact ("FONSIs").  In making the FONSIs, the preferred alternative Mid-City site was evaluated under both FEMA and NEPA regulations, and conditionally approved upon the determination of mitigation measures to be executed.  On November 25, 2008, it was formally announced that the preferred alternative Mid-City site bounded by Canal Street, Tulane Avenue, Galvez and Claiborne Avenue was selected as the location for the LSUMC and new VAMC.

In December 2008, FEMA began its second tier of environmental review for potential environmental impacts associated with design, construction, and operation of the LSUMC. Similarly, in February 2009, the VA began to develop an environmental assessment for its second tier of review.

On May 1, 2009, Plaintiff National Trust for Historic Preservation in the United States initiated this litigation against the VA; General Eric Shinseki, in his official capacity as Secretary of Veterans Affairs; FEMA; and Nancy Ward, in her official capacity as Acting Administrator of FEMA[1] (Rec. Doc. No. 1).  Plaintiff filed its Complaint in the U.S. District Court, District of Columbia, seeking an injunction "enjoin[ing] any property acquisition, demolition, site clearance, and construction related to the proposed medical centers" until the Defendants remedy certain alleged violations of NEPA, 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), in the PEA and FONSIs for the VAMC and LSUMC site locations (Rec. Doc. No. 1).  On August 7, 2009, the above captioned matter was transferred to this Court from the U.S. District Court, District of Columbia.  On January 7, 2010, the Court issued an Order granting the City and the State's Motions to Intervene (Rec. Doc. No. 73).  On January 28, 2010, the Court granted J. Gustave Speth, Dinah Bear, Ray Clark, and Gary Widman's Motion to File Brief as *Amici Curae* (Rec. Doc. No. 104).

## II.    LAW & ANALYSIS

After the commencement of the present litigation, all parties filed motions or cross-motions for summary judgment.  Additionally, the Administrative Record was lodged with the Court which contained almost 5,000 documents and 12,670 images.  The Court received extensive briefing from the parties and heard oral argument at a hearing on February 10, 2010.  The Court has reviewed the materials and considered the points made at oral argument and is now ready to rule.  In this Order and Reasons, the Court first reviews the applicable law, and then analyzes the parties' arguments under this law.

---

[1]Nancy Ward was terminated as a party from the present matter; subsequently, Craig Fugate, in his official capacity as Administrator of FEMA, was added as a defendant.

A.        The National Environmental Policy Act

Congress passed the National Environmental Policy Act to focus governmental and

public attention on the potential environmental effects of any proposed "major federal action."

*See* 42 U.S.C. § 4332; *Marsh v. Or. Natural Res. Def. Council*, 490 U.S. 360, 371 (1989).  The

Council on Environmental Quality (CEQ) regulations provide guidance to agencies in applying

the statute.  40 C.F.R. §§ 1500-1508; *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332 (1989).  In addition, the VA and FEMA have each promulgated agency-specific NEPA

regulations.  *See* 38 C.F.R. § 26, *et seq*. (VA regulations); 44 C.F.R. § 10, *et seq*. (FEMA

regulations).

NEPA's statutory and regulatory mandate is "essentially procedural...It is to insure a

fully informed and well-considered decision..."  *Vt. Yankee Nuclear Power Corp. v. Natural Res.

Def. Council*, 435 U.S. 519, 558 (1978).  The statute does not mandate a particular result, but

instead prescribes that federal agencies simply consider the potential environmental

consequences of proposed actions.  *Methow Valley*, 490 U.S. at 350; *see also O'Reilly v. U.S.

Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007)(quoting *Coliseum Square Ass'n v.

Jackson*, 465 F.3d 215, 224 (5th Cir. 2006)).  The environmental information required by NEPA

must be "available to public officials and citizens before decisions are made and before actions

are taken."  40 C.F.R. § 1500.1(b).  While NEPA does not command agencies to select an

environmentally preferable course of action, it does require the agency's decision to be

"environmentally conscious."  *Sierra Club v. Sigler*, 695 F.2d 957, 976 (5th Cir. 1983); *Holy

Cross v. U.S. Army Corps of Eng'rs*, 455 F.Supp.2d 532, 537 (E.D. La. 2006).

As a part of its procedural mandate, NEPA requires federal agencies to prepare an

Environmental Impact Statement ("EIS") for any major federal action "significantly affecting the

quality of the human environment."  42 U.S.C. § 4332(C).  If an action does not on its face

require an EIS, the agency may conduct an Environmental Assessment ("EA") to determine

whether an EIS is necessary.  40 C.F.R. §§ 1501.3-1501.4.  An EA must include a brief

discussion of the need for the proposed project, alternatives to the proposed action, and the

environmental impacts of both the proposed action and the alternatives.  40 C.F.R. § 1508.9(b).

As a part of its impacts analysis, an agency must examine direct, indirect, and cumulative

impacts.  *See* 40 C.F.R. §§ 1508.7, 1508.8.  The purpose of an EA is to "simply identify (and

assess the 'significance' of) potential impacts on the environment; it does not balance different

kinds of positive and negative environmental effects, one against another; nor does it weigh

negative environmental impacts against a project's other objectives." *Sierra Club v. Marsh*, 769

F.2d 868, 875 (1st Cir. 1985).  If, after a "hard look" at the proposed action and its potential

effects, the agency concludes that there will not be any significant environmental impacts, the

agency may issue a Finding of No Significant Impact (FONSI), and is not required to issue an

EIS.  *See Spiller v. White*, 352 F.3d 235, 237-38 (5th Cir. 2003).  Otherwise, if the record does

not support a FONSI, the agency must issue an EIS.  *Sabine River Auth. v. U.S. Dep't of Interior*,

951 F.2d 669, 678 (1992).

### B.      Standard of Review

NEPA does not contain a standard for judicial review.  The standard of review instead is

set forth in the Administrative Procedure Act's ("APA") provision for review of final agency

action, 5 U.S.C. § 706.  *See Or. Natural Res. Def. Council*, 490 U.S. at 377.  Under the APA, a

court may only set aside agency actions "found to be...arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law...."  5 U.S.C. § 706(2)(A).  The "arbitrary

and capricious" standard is "highly deferential.*"  La. Crawfish Prods. Ass'n v. Rowan*, 462 F.3d

352, 355 (5th Cir. 1991)(quoting *Sabine River Auth.*, 951 F.2d at 678).  The standard contains a strong presumption in favor of upholding agency decisions made within the scope of the agency's expertise.  *Or. Natural Res. Def. Council*, 490 U.S. at 377; *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).  An agency action is arbitrary and capricious only where "the agency has relied upon factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998).

Further, the standard is a narrow one and a court "should not substitute [its] own judgment for the agency's."  *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006)(citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  Though a court's review must be probing, it must only consider whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  If the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made," its decision must be upheld.  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983); *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995).

### C.    Arguments of the Parties

The Court has considered the arguments raised by the parties in their briefs and at the hearing.  It now will address these arguments in the following order: (1) the Federal Defendants' argument that Plaintiff's claims against FEMA are not yet ripe for review, (2) the State's

argument that Plaintiff lacks standing, (3) the State's argument that Plaintiff's suit is barred by the equitable doctrine of laches, and (4) the substantive arguments raised by all parties regarding whether the PEA and FONSIs were lawful under NEPA.

### 1.      Ripeness of Plaintiff's Claims Against FEMA

The Federal Defendants argue that because FEMA has not yet acted to obligate Public Assistance funds for the construction of the LSUMC, Plaintiff's claims against FEMA are not yet ripe for review.  They concede that FEMA has provided Public Assistance funds to repair Charity Hospital, but note that it has not provided funding or approval to use these funds to relocate or build the LSUMC.  Plaintiff challenges this argument on the basis that offers are already being made and executed to purchase property for the site, demolition contracts are being negotiated, and other concrete plans to move forward with the hospital are being put in place.  At oral argument the State noted that on January 27, 2010, the Federal Civilian Board of Contract Appeals awarded $474 million to the State from FEMA and directed FEMA to issue a Public Assistance grant for replacing Charity Hospital.

"In deciding whether a matter is ripe for review, the court must consider 'both the fitness of the issue for the judicial determination and the hardship to the parties of withholding consideration.' " *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 244 (5th Cir. 2006)(citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  In making this determination, the court should evaluate the following factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).  CEQ regulations intend judicial review of agency compliance with NEPA once an

agency issues a FONSI.  *See* 40 CFR § 1500.3.

 In the present matter, consideration of the ripeness factors listed above results in the conclusion that Plaintiff's claims against FEMA are ripe.  First, if Plaintiff is required to wait to bring its claims, further action on the medical facilities projects will occur without Plaintiff having its day in Court.  This is supported by the fact that FEMA is going forward now with its Tier 2 EA and that FEMA has been ordered to deliver Public Assistance funds and issue a grant for the replacement of Charity Hospital with the funds.  Second, the PEA and FONSIs have been issued and according to the CEQ regulations, judicial intervention at this time is appropriate.  Third, no further factual development is necessary for the Court to address the issues raised by the present matter as the complete administrative record and supplemental administrative record are before the Court.

      2.      **Plaintiff's Standing**

The State argues that the Plaintiff lacks standing in both its capacity as an organization and on behalf of individual members of its organization.  It relies upon *Lujans v.Defenders of Wildlife*, 504 U.S. 555 (1992), to support its argument that Plaintiff's general organizational interest in historic preservation and its member's general interest in the Mid-City Historic District are insufficient to establish standing.

Plaintiff submitted two affidavits as evidence of its standing.  The first is from Elizabeth S. Merritt, the Deputy General Counsel for National Trust.  Rec. Doc. No. 58-3.  Ms. Merritt states that "Congress chartered National Trust in 1949 to protect America's historic resources, and to facilitate public participation in the preservation of our nation's heritage," and that "the National Trust works to protect significant historic sites and to advocate historic preservation as a fundamental value in programs and policies at all levels of government."  *Id*.  Ms. Merritt's

declaration also states that, after Hurricane Katrina, National Trust opened a field office in New Orleans and spent four years working to preserve local historic buildings and rebuild devastated historic buildings.  *Id*.  She notes that one of the recipients of a grant from the Historic Building Recovery Grant Program, a program spearheaded by National Trust, who used the grant to rebuilt their flooded home, is now facing demolition of his home because it is in the footprint of the Mid-City site for the new hospitals.  *Id*.  The affidavit also details National Trusts close involvement with the NEPA process at issue in the present matter.  *Id*.

The second affidavit submitted by the Plaintiff is that of Jack Davis, a member of the National Trust.  Rec. Doc. No. 91.  Mr. Davis lives in New Orleans and has been "deeply involved in advocating for plans that would rebuild New Orleans while preserving her architectural and cultural heritage."  *Id*.  He states that he "use[s], enjoy[s], and appreciate[s] the historic districts of New Orleans, including the Mid-City Historic District."  *Id*.  He claims to "enjoy looking at the architecture of the historic houses in the Mid-City Historic District."  *Id*. He further claims that locating the new hospitals in the Mid-City location will "harm, impair or destroy my ability to use, enjoy, and appreciate the historic character and architecture of the neighborhood."  *Id*.  He additionally states that he will be harmed by the following effects from the Mid-City hospitals: traffic, construction noise and vibrations, exacerbation of blight, and delay of medical services in the New Orleans area.  *Id*.

In order to satisfy the Constitution's Article 3 standing requirements, a plaintiff must show, (1) that it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual member of the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl.*, 528 U.S. 167, 181 (2000)(citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). This is "not too heavy a burden," as even a "'probablistic benefit from winning a suit is enough injury in fact to confer standing under the Constitution.'" *Sabine River Auth. v. U.S. Dept. of Interior*, 951 F.2d 669, 674 (5th Cir. 1992)(citing *N. Shore Gas v. EPA*, 930 F.2d 1239, 1242-43 (7th Cir. 1991)). The Supreme Court has recognized that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Given the relatively low burden in establishing constitutional standing and Mr. Davis' allegations of potential injuries to the aesthetics in the city where he lives and in an area he visits for its aesthetic qualities, Plaintiff's constitutional standing is established on behalf of its member Mr. Davis. However, Plaintiff does not overcome the burden for establishing constitutional standing on behalf of the organization itself since it has not alleged a sufficient injury in fact by virtue of the project harming its general interest in historic preservation.

To bring suit under NEPA, a plaintiff must not only have constitutional Article 3 standing, but must establish that the injury he complains of falls within the "zone of interest" sought to be protected by the statutory provision whose violation forms the legal basis for the complaint. *Lujan v. Nat. Wildlife Fed'n*, 497 U.S. 871 (1990). In other words, the only people

who may sue to enforce a law are those who belong to the class that the law was designed to protect. *Sabine River Auth.*, 951 F.2d at 675. The very purpose of NEPA is to "encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. In the present matter, Mr. Davis, as resident of New Orleans who visits and enjoys the Mid-City Historical District, alleges the Federal Defendants' failure to comply with NEPA will adversely affect the environment of New Orleans and Mid-City. This injury is environmental and will be the result of final agency action, thus it falls within the interests protected by NEPA. *See City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1114 (9th Cir. 2009)(finding statutory standing under NEPA on the basis that the challenged action was final agency action that aversely affected plaintiff and which the plaintiff alleges caused injury to its interests in the environmental and in safety); *see also Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006)(finding statutory standing under NEPA on the basis that plaintiffs challenged final agency action which they alleged to have adversely affected the environment). Accordingly, the Court finds that Plaintiff has satisfied statutory standing on behalf of its member Mr. Davis.

> **3.    Equitable Doctrine of Laches**

The State argues that Plaintiff's suit is barred by the equitable doctrine of laches. It reasons that Plaintiff waited five months to initiate the present litigation, even though it was an active and integral player in the environmental review, and that this delay has prejudiced the State because it has expended substantial monies, may lose valuable contracts, and prolongs providing healthcare to its citizens. In response, Plaintiff contends that five months is a nominal delay for filing suit under laches and that laches cannot apply to the present matter because the challenged project has not yet reached an advanced stage.

There are three independent criteria which must be met before laches can be applied.

*Save Our Wetlands, Inc. v. U.S. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th Cir. 1977).

"The defendant must show: (1) a delay in asserting a right or claim; (2) that the delay was not

excusable; and (3) that there was undue prejudice to the party against whom the claim is

asserted."  *Id*.  In *Save Our Wetlands*, the Fifth Circuit addressed the application of laches in the

context of environmental litigation.  *Id*.  It held that laches barred plaintiffs claims because they

waited 19 months, at the least, and 37 years, at the most, from the actions complained of to file

their complaint; that the actions complained of were publicly well known; and defendants had

expended over $26,000,000 and large portions of the project had been substantially completed at

the time the complaint was filed.  *Id*. at 1026-30.  The present matter is distinguishable from

*Save Our Wetlands*; accordingly, the Plaintiff's claims are not barred by laches.  First, Plaintiff's

five month delay in filing the present matter is much less than the ambiguous 19 month to 37

year delay in *Save Our Wetlands*.  Second, the present matter challenges action that is only in the

preliminary stage of development,only the PEA on site selection, acquisition, and preparation

had been done, while in *Save Our Wetlands*, the construction project was substantially

completed.  Third, while in the present matter substantial monies have been expended to conduct

the PEA and PA, this amount, when compared with the project as a whole is a minor amount,

which is distinguishable from *Save Our Wetlands* where the $26 million constituted the majority

of the funds to be spent on the project as a whole.  Thus, laches does not bar the present action.

### 4.    NEPA Challenges to the PEA and FONSIs

Plaintiff raised four substantive challenges to the environmental assessment conducted by

the Federal Defendants in rendering their PEA and FONSIs. These arguments, which will be

discussed in the following order, are: (1) the PEA unlawfully utilizes segmentation, failing to

consider connected actions in the same document; (2) the PEA's cumulative or indirect impact

analysis is legally inadequate; (3) the Federal Defendants' tiering of the project was unlawful and arbitrary and capricious; and (4) the Federal Defendants' reliance on generalized mitigation measures to avoid preparing an EIS was arbitrary and capricious.

      **a.**     **Segmentation**

Plaintiff alleges that the Federal Defendants have violated NEPA by improperly segmenting the LSUMC and VAMC projects into separate phases and considering these phases independent of one another.  In support of its argument, Plaintiff notes that the PEA issued by the Federal Defendants regarding site selection and preparation of the hospitals project fails to consider all connected actions of the hospitals project, specifically it fails to consider later stages of the project such as design, construction, operation of the facilities, and disposition of the existing medical facilities.  It contends that the Council of Environmental Quality's NEPA regulations require that connected actions, such as these stages in the medical facilities project, are to be analyzed in the same document.  Plaintiff further argues that because the earlier stages of site selection and preparation have no independent utility apart from the later stages, and the later stages cannot proceed unless and until the earlier stages are complete, all the stages must be collectively considered in a single environmental assessment.  It contends that the segmentation of the environmental analysis for the different stages in the hospitals project deprives the public of important, relevant information about the effects of the project before decisions are made and actions are taken.

In response, the Federal Defendants argue that they have not segmented the hospitals project, but rather have considered both the VAMC and LSUMC projects, each major federal actions, together.  They further argue that Plaintiff mischaracterizes their separation of the initial and later stages of construction into Tier 1 and Tier 2 EAs as illegal segmentation of major

federal actions, when in fact these stages are merely part of the VAMC and LSUMC projects. The Federal Defendants contend that Plaintiff's segmentation argument is actually attacking the use of tiering, which is a legal argument entirely separate from segmentation.

      The State raises arguments largely similar to those urged by the Federal Defendants. Additionally, it claims that segmentation case law considers only whether a federal project has been improperly segmented to avoid compliance with NEPA, and argues that there is no record evidence that the Federal Defendants tiered their environmental review to avoid compliance with NEPA. Rather, according to the State, the PEA satisfies the requirements of NEPA by using tiering to provide the highest level of detail possible and containing an exhaustive review of impacts and mitigation measures.

      Improper segmentation occurs when an agency artificially divides a major federal action into smaller components to avoid the application of NEPA to one or more segments. *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992). "Segmentation cases consider only whether a federal project has been improperly segmented to avoid compliance with NEPA." *Id.* In such cases, the segmentation is challenged because state funded projects or federal projects involving action with less than significant environmental impacts are segmented from major federal actions, allowing the agencies to proceed with the segmented projects without having to comply with NEPA requirements. *See e.g. Highway J Citizens Group v. Minet*, 349 F.3d 938, 962-63 (7th Cir. 2003)(addressing improper segmentation claim where highway project, a major federal action, was segmented from bridge project, thus allowing agencies to avoid performing an EIS on the bridge project); *Save Barton Creek*, 950 F.2d at 1129 (addressing improper segmentation claim that state funded highway projects were segmented from federal highway projects, major federal actions, to avoid NEPA

compliance on the state funded highway projects).

In the present matter, the Federal Defendants acknowledge that the proposed LSUMC and VAMC projects constitute major federal action under NEPA, and as a result have completed the first PEA on the projects and are currently working on the second EA.  Improper segmentation occurs only where an agency artificially segments a project from a major federal action to <u>avoid</u> compliance with NEPA on that project.  Here, the Federal Defendants have considered both of  the hospital projects, major federal actions, together.  They have not selected certain segments of the projects which are state funded or less than significant federal action to segment from the hospital projects in order to avoid NEPA compliance.  Rather, they have worked to comply with NEPA's environmental assessment requirements as evidenced by the completed Tier 1 PEA and the Tier 2 EAs which are underway.  Accordingly, the Court finds that the Federal Defendants have not improperly segmented the LSUMC and VAMC proposed projects.

### b.    Consideration of Impacts[2]

Plaintiff argues that the PEA violates NEPA by failing to consider cumulative and indirect impacts.  It claims that the PEA must consider the impacts of construction, design, and operation of the LSUMC and VAMC facilities, as well as the impacts of not using the existing VA Hospital and Charity Hospital for the these facilities. Plaintiff additionally argues that the Federal Defendants, despite having enough information to do so, failed to include a discussion of reasonably foreseeable effects of the selection of the Mid-City site, specifically, the impacts

---

[2]Underlying the parties' arguments on consideration of impacts is whether the agencies' use of tiering was arbitrary and capricious under NEPA.  Tiering is more thoroughly discussed in the following subsection.

from: (a) noise, (b) traffic, (c) drainage and flooding, (d) contamination, and (e) socioeconomic effects and land use.  The Court will address these impacts in turn below.

In response to Plaintiff's argument regarding consideration of impacts, the Federal Defendants contend that the PEA fully disclosed all reasonably foreseeable impacts from the proposed LSUMC and VAMC projects.  It claims that the PEA contains a discussion of the potential direct and indirect impacts to the physical environment, water and coastal resources, land use, infrastructure and utilities, cultural resources, socioeconomics, transportation and traffic, human health and safety, biological resources, air quality, flooding impacts, and noise and vibrations.  It further claims that it provided an "extensive" discussion on the historic nature of the existing hospitals and the historic properties that the two new hospitals would likely impact.  The Federal Defendants also allege that the PEA takes the requisite hard look at cumulative impacts, and note that by considering both the VAMC and LSUMC projects together, a more thorough analysis of cumulative impacts results.  The State and City raise largely the same arguments as the Federal Defendants.

An environmental assessment under NEPA "[s]hall include brief discussions...of the environmental impacts of the proposed action."  40 C.F.R. §1508.9.  In these discussions,

> An EA must analyze the...effects of the proposed action that are 'reasonably foreseeable,' which [the Fifth Circuit] ha[s] defined as effects 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'  'Reasonable foreseeability' does not include 'highly speculative harms' that 'distort the decisionmaking process' by emphasizing consequences beyond those of 'greatest concern to the public and of greatest relevance to the agency's decision.'  'A but for causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations.  Rather, a plaintiff mounting a NEPA challenge must establish that an alleged effect will ensue as a proximate cause, in the sense meant by tort law, of the proposed agency action.'  *City of Dallas v. Hall*, 562 F.3d 712, 719 (5th Cir. 2009)(internal citations omitted).

The CEQ provides for the following types of environmental impacts: direct, indirect, and

cumulative.  *See* 40 C.F.R. §§ 1508.7, 1508.8.  These impacts include, but are not limited to

effects "ecological (such as the effects on natural resources and on the components, structures,

and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or

health." 40 C.F.R. § 1508.8.  Direct impacts are "caused by the action and occur at the same time

and place."  40 C.F.R. § 1508.8(a).  Indirect impacts "are caused by the action and are later in

time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

"Cumulative impact is the impact on the environment which results from the incremental impact

of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

Cumulative impacts can result from individually minor but collectively significant actions taking

place over a period of time."  40 C.F.R. § 1508.7.

> i.    *Noise*

Plaintiff alleges that the hospitals will have noise impacts on the adjacent

neighborhood, yet it asserts that the Federal Defendants have not performed a noise study to

evaluate the effect of building and operating the hospitals.  Plaintiff cites as support *Coliseum*

*Square Ass'n, Inc. v. Jackson,* 465 F.3d 215 (5th Cir. 2006), in which the Fifth Circuit found a

federal agency complied with NEPA by performing a noise study projecting the noise impact of

construction and increased traffic for its EA impacts analysis.  In response, Defendants contend

that they took a hard look at the noise impacts in the PEA.  They claim that the PEA explicitly

identifies noise impacts associated with both construction and operation of the hospitals.  They

also note that the Tier 2 EA will contain even more detailed analysis of the noise impacts.

The Court has considered the parties arguments and the PEA admitted into evidence.

The PEA contains an entire section devoted to the discussion of noise and vibrations.  *See* PEA

at 3-110 to 3-118.  Within this section, the agencies discuss both the existing noise and vibration at the Mid-City site and the noise and vibrations that will result from the construction and operation of the hospitals.  *See id.*  They provide details on (1) the noise and vibrations expected from various construction equipment, (2) the areas of the adjacent neighborhood that will be affected and to what degree, (3) the increase of noise emergency medical vehicular traffic and helicopters, and (4) note that the historic properties may suffer more than other properties from the vibrations.  *See id.*  The PEA also contains a diagram of the predicted noise levels at the proposed LSUMC site.  PEA at 3-112.  The PEA shows that the agencies consulted the Highway Construction Noise Handbook issued by the Federal Highway Administration, PEA at 7-5, and the State of Louisiana's Noise Assessment Survey for the LSUMC.  PEA at 7-14.  At oral argument, the Defendants indicated that the Tier 2 EA will contain even more detailed information on noise and vibrations because more information about the facilities will be known. The Court finds that the discussion of noise impacts in the PEA satisfies NEPA's mandate that agencies provide a "brief discussion" of the environmental impacts of the proposed action.

Additionally, the case relied upon by the Plaintiff, *Coliseum Square Ass'n*, 465 F.3d 215, is factually distinguishable from the present matter.  In *Coliseum Square Ass'n*, the agency whose action was contested under NEPA was the United States Department of Housing and Urban Development ("HUD").  465 F.3d 215.  Under HUD-specific regulations, HUD is required to prepare an EIS prior to approving projects with unacceptable noise exposure of 75 decibels or greater, based upon a 24-hour weighted average of sound levels.  *Id.* at 229; 24 C.F.R. § 51.104(b)(2).  As a result, HUD performed a detailed noise survey prior to determining that it was not required to conduct an EIS.  *Coliseum Square Ass'n*, 465 F.3d at 229-31.  The Fifth Circuit held that the HUD regulation did not require an EIS and that HUD did not fail to act

in accordance with the law in performing this study.  *Id.* at 231.  In the present matter, Plaintiff

does not allege that FEMA or VA is required under their agency-specific regulations to conduct

an EIS if a project reaches a certain level of noise exposure.[3]  Accordingly, there is not the same

need as there was in *Coliseum Square Ass'n* to conduct a noise study to determine whether an

EIS is necessary.

        ii.    *Traffic*

Plaintiff argues that the agencies have failed to properly consider the impacts of traffic

from the hospitals on the adjacent neighborhood.  Plaintiff again cites *Coliseum Square Ass'n*,

465 F.3d 215, in which the Fifth Circuit upheld a FONSI issued with regard to traffic impacts

where HUD and local agencies conducted numerous traffic studies, as support that the agencies

in the present matter, who have not conducted traffic studies, have failed to take a hard look at

traffic impacts under NEPA.  Plaintiff also claims that the PEA acknowledges that several streets

will be closed off, but the agencies defer analyzing how this will impact traffic until the Tier 2

EA.

In response, the Defendants point out that the PEA does consider potential impacts

associated with traffic, and that the PEA acknowledges that certain aspects of potential impacts

to traffic could not be adequately analyzed until specifics of site design were known.  They

allege that once designs for the facilities are determined, more thorough traffic impacts will be

discussed.

The Court has considered the arguments raised by the parties and the record evidence.

---

[3]The Court recognizes that HUD is involved in the present matter as a source of funding for the City's land acquisition responsibilities associated with the selection of the new location for the VAMC.  However, unlike *Coliseum Square Ass'n*, 465 F.3d 215, HUD is not the agency conducting the EA under NEPA and is involved merely as a source of funding.

The PEA provides general information on traffic impacts, but acknowledges that because a site had not been selected and the design of the facilities is unknown, it can not contain information on specific traffic impacts.  PEA at 3-2 to 3-3.  Despite the limited information available on traffic impacts, the PEA devoted an entire section to a discussion of transportation impacts, which includes traffic considerations.  PEA at 3-89 to 3-94.  This section discusses the current roadway network and public transit options that will be used to get to and from the Mid-City site of the hospitals.  PEA at 3-90.  It additionally discusses the direct and indirect traffic impacts. PEA at 3-93 to 3-94.  The PEA states that the direct traffic impacts of the new facilities will be that the traffic patterns will reestablish vehicular usage similar to that prior to Hurricane Katrina, that local streets will be closed, and that during construction there will be a large number of construction vehicles.  PEA at 3-93.  It further states that once the project designs move forward, design-specific traffic studies can be performed.  *Id*.  The PEA also states that the indirect traffic impacts of the new facilities will be alteration of routine traffic patterns which may result in increased commute time for local residents or redirecting consumer traffic, and the development of additional public transportation and pedestrian and cycling options in the area.  *Id*.  Given the available information at the time the PEA was issued, the Court finds that the agencies' discussion of traffic impacts is sufficient under NEPA.  Additionally, the Court finds that the Plaintiff's argument that the consideration of traffic impacts is insufficient under *Coliseum Square Ass'n* is premature as Plaintiff has yet to fully consider traffic impacts.  Once the agencies have the necessary design information on the hospitals, they have indicated that they will perform traffic studies and use this information in their Tier 2 EA to more thoroughly discuss traffic impacts.  Accordingly, the Court finds that the agencies have complied with NEPA regarding their consideration of traffic impacts.

iii.     *Drainage & Flooding*

Plaintiff argues that the agencies failure to consider the drainage and flooding impacts of the hospitals in the PEA is arbitrary and capricious.  Plaintiff alleges that the VAMC will be built three feet above grade, causing a significant drainage impact on adjacent properties that lie within the same floodplain, and that this was reasonably foreseeable at the time the PEA was issued.  It also alleges that the property where the VAMC will be built is below sea level and has a medium to high risk of flooding.  Plaintiff cites Executive Order No. 11988, 42 Fed. Reg. 26,951 (May 24, 1997), requiring agencies to evaluate the effects of proposed actions on floodplains and to avoid taking action affecting such areas unless there are no "practicable alternatives" in support of its argument.  It also cites as support, *Sierra Club v. Hassell*, 636 F.2d 1095, 1100 (5th Cir. 1981), which held that agencies complied with Executive Order No. 11988 by fully evaluating the effects of the proposed rebuilding of a bridge on an island's wetland and floodplain values, considering and rejecting alternatives to reconstruction for sound reasons, and providing the public an opportunity to comment on the issue.

In response, the Defendants argue that the PEA does recognize the potential flooding impacts of the LSUMC and VAMC.  They note that the PEA also recognizes that the details of the flooding impacts and any necessary mitigation requires knowledge of the design of the hospitals and thus will be included in the Tier 2 EA.  The Defendants also note that the PEA includes references to floodplain data.

The Court has considered the parties' arguments and the record evidence involving flooding and drainage impacts.  The PEA provides information on the topography and floodplains of all the sites the agencies considered, including the Mid-City site.  PEA at 3-4 to 3-5.  With regard to the Mid-City site, the PEA reports that it is relatively level, with elevations

ranging from 0-5 feet above mean sea level, and that it is within both the FEMA 100-year and 500-year floodplains.  PEA at 3-5.  The PEA includes figures depicting each of the sites considered with respect to their location within these floodplains.  PEA at 3-6 to 3-7.  It also references Executive Order No. 11988 requiring federal agencies to minimize the occupancy of and modification to the floodplain unless there is no practical alternative.  *Id.*  Additionally, the PEA discusses direct and indirect flooding impacts from the Mid-City site.  PEA at 3-9.  It acknowledges that because the project will be in the 100-year floodplain, all new construction activities will result in adverse impacts to floodplains as described in EO 11988 and the drainage pattern of the surrounding area.  *Id.*  It sets out mitigation measures, such as coordination with FEMA and the New Orleans Sewage and Water Board to minimize flooding and drainage problems, and elevation of the hospitals.  *Id.*  It provides that the elevation methods and impacts will be addressed in the Tier II EA.  *Id.*  In terms of indirect impacts, the PEA provides that storm water management efforts in the surrounding areas could be adversely affected.  *Id.*  With regard to water, sewage, and drainage at the Mid-City site, the PEA provides that existing facilities are sufficient and ready for use.  PEA at 3-24.  Finally, the PEA shows that the agencies consulted the U.S. Fish and Wildlife Service's National Wetlands Inventory Online Mapper, and the U.S. Geological Society's Water Quality Assessment in Southern Louisiana.  PEA at 716.  The Court finds that these considerations satisfy NEPA's mandate that agencies provide a "brief discussion" on impacts to their proposed major federal action.

Furthermore, *Sierra Club v. Hassell*, 636 F.2d 1095, relied upon by the Plaintiff, actually supports the Court's conclusion that the agencies have complied with NEPA regarding their consideration of drainage and flooding impacts.  In *Hassell*, plaintiff challenged federal agencies' FONSI on wetlands and floodplain impacts of a project under EO 11988.  636 F.2d at

Page 26

1100.  The Fifth Circuit found that the agencies had not violated NEPA or EO 11988 by their issuance of a FONSI on these impacts.  *Id.*  The Fifth Circuit based its decision on the following, (1) the agencies fully evaluated the effects of the project on wetlands and floodplain values, (2) the agencies considered alternatives to the project and rejected them with sound reasons, and (3) although the agencies did not provide for public review of the project devoted solely to the consideration of its impacts on wetlands and floodplain values, the public was given the opportunity to express views on these aspects.  *Id.*  In the present matter, similar steps were taken by the agencies.  As indicated above, the agencies included the consideration of drainage and flooding impacts in the PEA, and they have indicated they will provide even more thorough analysis on these impacts in the forthcoming Tier 2 EAs.  Also, the agencies considered alternatives to the project, specifically the flooding and drainage impacts of putting the hospitals at three sites, the Mid-City site, the Lindy Boggs locations, and the Ochsner location.  PEA at 3-5 to 3-7.  It also included maps of the flood zones for each of these sites which showed that all sites were located in flood zones.  *Id.*  Finally, the agencies held three public meetings, provided for a public comment period, and maintained a website for public commenting on the projects, allowing the public to comment on drainage and flooding impacts.

> iv.   *Contamination*

Plaintiff argues that the agencies failed to take a hard look at contamination impacts of the LSUMC and VAMC projects in violation of NEPA.  Plaintiff claims that the Administrative Record contains two reports which conclude that health hazards due to contamination released during excavation and demolition are likely and recommend a second analysis on the issue.  *See* Rec. Doc. No. 109-8.   It further claims that the PEA is silent as to these contamination impacts and merely lists sources of contamination at or near the site.  Plaintiff cites in support of its

argument, *Holy Cross v. U.S. Army Corps of Eng'rs*, 455 F.Supp.2d 532, 540 (E.D. La. 2006),

which held that the Corps' failure to take a hard look at the environmental impacts and

consequences of dredging and disposing of a canal's contaminated soil violated NEPA.

In response, Defendants argue that the PEA identifies and considers impacts to human

health and safety, including from existing site contamination.  They also note that the materials

cited by the Plaintiff are actually part of the administrative record which the agencies considered

in rendering their PEA.  Defendants contend that the reports cited by the Plaintiff which

recommend further assessments to be conducted only apply to six of the 450 property parcels.  It

notes that the Memorandum of Understanding entered into by the VA and City recognizes the

need for the further assessment on these parcels.

The Court has considered the arguments raised by the parties and the relevant evidence.

The PEA contains the following information on contamination impacts.  It discusses the

presence of the following contaminates at the various sites considered: underground storage

tanks ("USTs"), contaminated soil and groundwater, hazardous materials/hazardous waste,

asbestos containing building materials ("ACBM"), lead-based paints, polychlorinated biphenyls

("PCBs"), and mold.  PEA 3-95 to 3-102.  Additionally, a survey of above ground storage tanks

("ASTs") with a capacity over 100 gallons was conducted for areas within an approximate one-

mile radius of the proposed sites.  PEA at 3-95.  The VA hired an outside company to conduct a

Phase I environmental site assessment on the Mid-City site in November 2007.  PEA at 3-97.

The assessment identified the following human health and safety concerns with the Mid-City site

and proximate area: USTs at five locations, leaking underground storage tank at one location,

potential petroleum or hazardous material release at 16 locations, hazardous materials/hazardous

waste, radiation sources at five locations, Prospective State Brownfield sites at three locations,

mold, asbestos, and lead in structures.  PEA at 3-97 to 3-98.  With regard to direct impacts, the

PEA provides that the areas containing contamination will require remediation which will

potentially expose workers to hazardous materials and other hazardous environments.  PEA at 3-

100 to 3-101.  It also states that natural barriers exist between the site and each AST which will

eliminate the need to apply HUD safety standards.  *Id.*  With regard to indirect impacts, the PEA

provides that there is the potential for uncontrolled release of hazardous materials currently

contained within the project areas as to cause off-site contamination and result in non-

occupational exposures.  PEA at 3-101.  However, the PEA notes that these impacts will only

occur during abatement, demolition and remediation and can be controlled with strict adherence

to applicable regulations and the use of best management practices.  *Id.*  Finally, the PEA states

that the demolition and clearing of the site will result in significant amounts of solid waste which

must be transported off-site.  *Id.*  The Court finds that this discussion of contamination impacts,

which was supported by thorough scientific testing and surveys, satisfies NEPA's requirement

for a brief discussion of impacts.

Additionally, the case relied upon by the Plaintiff is inapposite to the present matter.

*Holy Cross* involved a challenge to a project to modernize a lock which required dredging,

releasing, and disposing of allegedly hazardous waste-contaminated sediments.  455 F.Supp.2d

532.  At issue was the fact that the EIS for the project was conducted prior to Hurricane Katrina

and prior to the Corps adoption of dredging and disposal alternatives.  *Id.* at 540.  The court

found that the Corps had failed to take a hard look at the environmental impacts because of these

recent significant events.  *Id.*  In contrast, the present case does not involve an EIS, only an EA,

and there are no allegations that the Mid-City site for the hospitals has undergone significant

changes or that FEMA or the VA have issued new contamination regulations since the issuance

of the PEA.

>            *v.*      *Land Use & Socioeconomics*

Plaintiff argues that the agencies failed to put forth evidence from the record showing

that they have taken a hard look at land use and socioeconomic impacts.  It further argues that

the CEQ regulations require that agencies perform an EIS when significant impacts may occur,

and that the government bears the burden of supporting its FONSI.

With regard to socioeconomic impacts, Plaintiff argues that the only record evidence

cited by the Defendants is two chain emails on the effect of relocating homeowners and

residents.  Further, Plaintiff claims that the agencies have failed to demonstrate sources of

sufficient funding for relocation.  It also claims that the agencies have not put forth any reliable

information on residents or businesses.  Plaintiff cites *National Audubon Society v. Department*

*of Navy*, 422 F.3d 174 (4th Cir. 2005), which required the Navy to collect information on the

location of waterfowl before concluding an airport would have no significant impact, as

requiring the agencies in the present matter to collect information on the residents of the Mid-

City site before issuing the PEA.

With regard to land use impacts, Plaintiff points to an assessment of current planning and

zoning issues, Rec. Doc. No. 109-9, and comments from a draft Environmental Justice Study,

Rec. Doc. No. 109-13, both part of the Administrative Record, which demonstrate that the

LSUMC and VAMC projects will cause significant beneficial land use impacts.  Plaintiff

criticizes the Defendants' use of "inflated denominators," such as "only 6% of the Mid-City

Historic District will be affected," as creating the false impression that land use impacts are

minimal.  It next contends that although many people in New Orleans will not be directly

affected by the hospitals projects, it is the agencies' obligation to study the projects' impacts on

the affected interests as well as the locality.

In response, the Defendants claim that NEPA requires consideration of context and intensity when determining whether any impacts will be significant, and the agencies considered potential socioeconomic and land use impacts in a broader context than just local interests as required by the CEQ. They also note that they used public involvement to focus the scope of their environmental review. With regard to socioeconomic impacts, the Defendants note that the PEA contains a detailed description of existing population and housing demographics which is supported by numerous scientific data and reports. The Defendants allege that this information coupled with the relief provided by the Uniform Relocation Act ("URA"), 42 U.S.C. §§ 4601-4655, led to the agencies' decision that population impacts would not be significant and impacts to housing availability and small businesses could be mitigated.

With regard to land use impacts, the Defendants argue that Plaintiff does not properly challenge whether the agencies failed to take a hard look at these impacts, but rather just disagrees with their finding of no significant impact which does not arise to arbitrary and capricious decision-making under NEPA. The Defendants allege that the PEA considered all potential sites for city planning and individual property purposes.

The Court has considered the arguments raised by the parties in their briefs and at oral argument, and has reviewed the relevant record evidence on socioeconomic and land use impacts. CEQ regulations require that agencies consider both the context and intensity of impacts. 40 C.F.R. § 1508.27. "[T]he significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action....Both short- and long-term effects are relevant." *Id*. Intensity refers to the severity of the impact. *Id*.

Page 31

Accordingly, the agencies in the present matter were required to consider the socioeconomic and land use impacts in a variety of contexts and an in a variety of degrees, not just impacts on the locality as Plaintiff suggests.

With regard to socioeconomic impacts, the Court finds that the agencies have taken a hard look under NEPA based upon the following information included in the PEA.  First, the PEA contains the following relevant information.  The PEA discusses the population and housing conditions at the existing Charity Hospital and VAMC sites, which includes information on the population before and after Hurricane Katrina, race and ethnicity of residents, and availability of affordable housing.  PEA at 3-62 to 3-64.  The PEA also discusses the population and housing conditions at each proposed site.  PEA at 3-64 to 3-67.  With regard to the Mid-City site, there is information on the percentage of active residences after Hurricane Katrina, the loss of housing units as a result of the Hurricane, the number of persons residing in the site, and the percentage of minorities residing in the site.  PEA at 3-64 to 3-65.  The PEA even contains a discussion of the notable "community cohesion" in the Mid-City site area, as evidenced by residents returning home to repair their homes after Hurricane Katrina despite significant obstacles and the existence neighborhood groups.  PEA at 3-65 to 3-66.

The PEA also contains discussions of direct and indirect socioeconomic impacts.  The PEA states that the resident population and housing on the Mid-City site will be directly impacted because they will be removed from the area.  PEA at 3-68.  However, the PEA also states that the majority of the areas within the site are empty lots, vacant structures, or surface parking lots.  *Id*.  618 persons residing in 265 housing units will be displaced and relocated.  *Id*.  The PEA states that because this is only a relatively small number of persons, the population of the City will not be significantly affected.  *Id*.  The PEA concedes that the displacement of

residents will have an adverse effect on housing, but that this impact will be reduced through mitigation measures pursuant to the URA and Louisiana's expropriation provisions.  PEA at 3-68 to 3-69.  It also notes that these mitigation measures would apply to businesses and nonprofit organizations as well.  PEA at 3-69.  With regard to renters, the PEA acknowledges the lack of available affordable housing, but notes this has been improved by the Road Home Small Rental Program and Gulf Opportunity Zone.  *Id*.  The PEA also acknowledges that community cohesion will be disrupted by relocation of residents, some of whom have lived in the area for generations, and by the severing of the neighborhood by the location of the hospitals.  *Id*.

The PEA next provides that if displaced residents remain in the Mid-City site area, an indirect impact will result from the increase in demand for housing.  PEA at 3-70.  However, the PEA notes that 35% of residential addresses in the area are unoccupied, and although many are damaged, there is likely more than enough residential units to meet this demand.  *Id*.  The PEA also states that property values around the hospitals will be expected to increase, employment in the area will likely increase, but available housing may be limited.  *Id*.

The PEA supports these findings with the following: U.S. Census Bureau Data, PEA at 7-14 to 7-15, data from the Greater New Orleans Community Data Center, PEA at 7-6, data from the Louisiana Housing Finance Agency, PEA at 7-9, a site-specific study by Environmental Systems Research Institute, Inc., PEA at 7-4, and the use of site reconnaissance to identify occupied residential parcels, PEA at 7-16.  Whether or not the Court agrees with the agencies' conclusions is not the issue.  The issue is whether or not these matters have been adequately studied and considered and the Court concludes that they have been.

The emails criticized by the Plaintiff as insufficient evidence that the agencies took a hard look at socioeconomic impacts, VAN 1-9386, VAN1-9362, indicate that the agencies

properly considered public comments on the project and worked to incorporate the concerns raised in the comments into the PEA. This is what is required by NEPA. *See* 40 C.F.R. §§ 1501.4(b), 1506.6(a). Additionally, as discussed above, the agencies relied upon numerous sources to reach the conclusions on socioeconomic impacts, not just these two emails.

The Plaintiff also criticizes the information in the PEA on sources of funding for relocation. However, the PEA states that URA and Louisiana's expropriation provisions will provide assistance with relocation for home and business owners, while the Road Home Small Rental Program and Gulf Opportunity Zone will provide assistance with relocation for renters. PEA at 3-69. The URA provides that "no person to be displaced [by federal and federally-assisted programs] shall be required to move from his or her dwelling unless at least one comparable replacement dwelling has been made available to the person. When possible, three or more comparable replacement dwellings shall be made available." 49 C.F.R. § 24.204 (internal citation omitted). The URA also provides owners and tenants with payment of actual moving and related expenses, 49 C.F.R. § 24.301, replacement housing payment up to $22,500, 49 C.F.R. § 24.401, and additional "housing of last resort" funding if comparable housing is not available, 49 C.F.R. § 24.404.

Plaintiff relies upon *National Audubon Society*, 422 F.3d 174, to support its argument that the agencies have not taken a hard look at socioeconmic impacts. *National Audubon Society* involved a challenge to a final EIS, 422 F.3d at 187, while at issue in the present matter is a PEA which places a much smaller burden on agencies-to provide a brief discussion of potential impacts. Additionally, *National Audubon Society* addressed whether the Navy's site visits and radar studies on waterfowl in a National Wildlife Refuge provided sufficient information on whether the waterfowl would be significantly impacted by the construction of an airport. *Id.*

Page 34

The Fourth Circuit held that the visits and studies did not satisfy the hard look standard because they "did not provide a meaningful opportunity to conduct systematic observations or perform species-specific studies....[n]or could long-term data be collected." *Id.* At 189. The impacts of a proposed airport on waterfowl which seasonally migrate to the area around the airport and the socioeconomic impact of displacement of residents and disruption of a close-knit community by the construction of hospitals are so factually distinguishable that the Court cannot reasonably compare the two cases and feels no need to do so.

With regard to the agencies' consideration of land use impacts, the Court finds that they have taken a hard look under NEPA for the following reasons. First, the PEA contains the following information on land use: the current land use conditions for Charity Hospital and the VAMC, the land use for the three proposed sites, land use maps of the Mid-City site, and the land use impacts of the three proposed sites and renovation of the existing sites. PEA at 3-13 to 3-21. In the description of the current land use for the Mid-City site, the PEA states the following: the site is within City Planning District 4, the district is characterized as historic, the various percentages of land use types, the various zoning specifics, and that the site is within the New Orleans Medical District under the Unified New Orleans Plan. PEA at 3-14. The PEA further provides land use specifics for each of the proposed hospitals. *Id.* It states that the VAMC site consists of 30 acres, 12 city blocks, and 184 parcels, of which 63 are occupied residential, 16 are active commercial, 65 uninhabited residential, 17 inactive commercial, and 23 vacant lots. *Id.* It states that the LSUMC site consists of 37 acres, 15 city blocks, and 276 parcels, including 31 occupied residential, 27 occupied commercial, 27 vacant residential, 17 vacant commercial, and 174 vacant lots. *Id.* Charts detailing the status of the parcels within each site are also included in the PEA. PEA at 3-15 to 3-16.

The PEA also discusses land use impacts that may result from the proposed hospital projects. It states that the existing mixture of land uses will be directly impacted by the removal of existing structures and the construction of medical-related buildings in their places. PEA at 3-18. However, the PEA notes that less than half of the affected parcels are active and that conversion to medical-related buildings is consistent with the development plans for the area. PEA at 3-18 to 3-19. The PEA states that another direct impact is that current residents and business will be displaced. PEA at 3-19. The PEA also provides that the change in land use to medical uses will likely have indirect impacts on adjacent land uses, such as the numerous vacant or unoccupied parcels in the area will be redeveloped, promote further development of the medical district and redevelopment of residential areas. *Id.*

Plaintiff cites to an assessment of current planning and zoning issues, VAN001-8916 to 8928, and comments from a draft Environmental Justice Study, FEMA AR 010593, as support that the hospital projects will cause a significant beneficial impact. These documents are part of the Administrative Record and thus were considered by the agencies in developing the PEA. However, they do not provide conclusive evidence that the land use impacts are significant. The assessment states on the first page that the document was an "informal review of planning and zoning issues [the hospital projects] present to advise the Planning Commission of any early action zoning or planning actions that the CPC should undertake ahead of completion of the Master Plan and new Comprehensive Zoning Ordinance (CZO)." VAN001-8916. The assessment was not done to evaluate land use impacts under NEPA, but was done "informally" and for an altogether different purpose. The comments on the draft report state that the hospitals projects "will necessarily alter the fabric of land uses and disrupt the functioning of neighborhoods." FEMA AR 010593. These conclusions are not the result of a scientific study,

but rather just comments in response to draft report, a document not cited by the Plaintiff. Additionally, the change in land use and the disruption of neighborhoods are both discussed in the PEA and thus these documents add nothing new to the discussion of impacts.

  c.  **Tiering**

   Plaintiff argues that the agencies' use of tiering is arbitrary and capricious for the following reasons.  Plaintiff claims that because the agencies have not prepared an EIS, the predicate for an agency to engage in tiering under CEQ regulations, the tiering is unlawful. Plaintiff contrasts the tiering in the present matter with the tiering upheld by the Fifth Circuit in *Coker v. Skidmore*, 941 F.2d 1306 (5th Cir. 1991) and *Louisiana Crawfish Producers Ass'n v. Rowan*, 463 F.3d 352 (5th Cir. 2006), both of which involved an EA containing an environmental analysis on a segment of agency action tiered to a previously existing EIS involving broader environmental analysis of that agency action.  Plaintiff claims that separation of the medical centers projects into Tier 1 and Tier 2, and the issuance of a separate EA for each tier at a different time, essentially divides the project in half in contravention of CEQ regulations requiring the frontloading of all general project information in the Tier 1 PEA and then following upon with more specific information on elements of the project in the Tier 2 EAs .

   Additionally, Plaintiff claims that the tiered analysis allows the defendants to make an irretrievable commitment of resources and causes surfaces disturbances under the FONSIs issued for the Tier 1 PEA, foreclosing the use of alternative sites before taking a hard look at the impact of using the Mid-City site for the medical centers.  It cites *'Illio'Ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), as support that an agency cannot select a site for a project in tier 1, go forward with the project, and then analyze and presumably approve the site-specific consequences of the site in tier 2.  Additionally, Plaintiff claims that the agencies had

before them all the necessary information to consider the impacts of Tier 2 concerns of design, construction, and operations, and thus there was no need to tier.  Finally, Plaintiff argues that the issuance of the Tier 2 EAs cannot "cure" the deficiencies in the Tier 1 PEA and cites in support, *Protect Key West, Inc. v. Cheney*, 795 F.Supp. 1552 (S.D. Fla. 1992), which held subsequent site-specific studies could not remedy a deficient EA.

In response to Plaintiff's argument, the Defendants contend that NEPA regulations actually encourage agencies to tier their environmental review so they can focus on actual issues ripe for decision at each level of review.  The Defendants note that the agencies turned to NEPA regulations for compliance strategy and coordinated with the CEQ before deciding upon the tiering approach.  The tiering approach was chosen because of the practical limitations on obtaining information on impacts such as infrastructure, archaeology, traffic, noise, and flooding, before the design and related infrastructure of the medical complexes were known.  They also add that the tiering allowed for a faster process which was necessary given the urgent need for the restoration of health care services in the New Orleans area.

The Defendants further contend that they are granted the discretion to determine the type of environmental assessment to perform.  They note that the Fifth Circuit has adopted the "rule of reason" which requires that consideration be given to practical limitations on the agency's analysis, such as information available at the time.

The Defendants deny that any irretrievable commitment of resources has been made by the issuance of the Tier 1 PEA and FONSIs.  They note that FEMA has yet to officially approve funds for the project, no relocations or demolition has occurred, and only four titles out of the 194 parcels on the new VAMC site have been acquired.  Additionally, they claim that investigation, discussion and consideration of impacts, alternatives, and mitigation methods

considered in the Tier 2 EAs could alter the medical center projects.

Furthermore, the Defendants note that the Tier 2 EAs are underway and that once they are issued, Plaintiff's arguments regarding tiering will be rendered moot.  They note that the remedy for an inadequate EA is remand to the agencies to correct the deficiencies in the analysis, and argue that the Tier 2 EAs will remedy any inadequacies alleged by the Plaintiff.

The CEQ regulations require agencies to integrate the NEPA process "at the earliest possible time...to avoid delays later in the process" and  "[i]dentify environmental effects and values in adequate detail."  40 C.F.R. § 1501.2.  CEQ regulations also encourage tiering "to focus on the actual issues ripe for decision at each level of environmental review."   40 C.F.R. § 1502.20.[4]   Tiering is appropriate where there is an initial NEPA review on a specific action at an early stage, such as "site selection," and there is a subsequent supplement, statement or analysis at a later stage, such as "environmental mitigation."  40 C.F.R. § 1501.2; *Ctr. for Biological Diversity v. U.S. Dept. Int.,* 563 F.3d 466, 474 (D.C. Cir. 2009). "Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."  *Id.*  Agencies have discretion to tier the analysis of a general, broader NEPA assessment to a more narrow analysis relevant to a specific aspect of that assessment.  *See generally Sierra Club v. Jacobs*, 2005 WL 6247793,

---

[4]Although 40 C.F.R. § 1502.20 and other CEQ regulations reference federal agencies' responsibilities with regard to environmental impact statements, omitting reference to environmental assessments, these "regulations also outline the requirements for preparing an EA." *Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997); *Natural Res. Def. Council, Inc. V. U.S. Dept. Navy*, 2002 WL 32095131, *15 n.10 (C.D. Cal. Sept. 17, 2002); *Hirt v. Richardson*, 127 F.Supp.2d 833, 841 (W.D. Mich. 1999).  However, the analysis in an EA is less comprehensive and less concise than in an EIS.  *Dept. Of Transp. v. Public Citizen*, 541 U.S. 752, 757 (2004); *California Trout v. F.E.R.C.*, 572 F.3d 1003, 1026 (9th Cir. 2009).  The Fifth Circuit has described the EA as "rough cut, low-budget EIS."  *City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009).

*12 (S.D. Tex. Sept. 30, 2005).

The Fifth Circuit recognizes that a court "must not 'substitute [its] judgment for that of the agency,' and it must 'avoid placing extreme or unrealistic burdens on the compiling agency.' Because the 'analysis of the relevant documents requires a high level of technical expertise, [courts] must defer to the information discretion of the responsible federal agencies.'" *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). As a result, the Fifth Circuit has adopted the "rule of reason," *Miss. River Basin Alliance,* 230 F.3d at 175, which requires that "consideration be given to practical limitations on the agency's [NEPA] analysis, such as the information available at the time." *Wilderness Soc'y v. Salazar*, 603 F.Supp.2d 52, 61 (D.D.C. 2009). Further, the Supreme Court has recognized that under NEPA it is impossible to analyze the environmental consequences, resource commitments, and alternatives to a proposed activity without the presence of an overall, broader plan in place. *See e.g. Kleppe v. Sierra Club*, 427 U.S. 390, 402 (1976). Additionally, when proposed agency action is too large to complete at one time and involves many separate sub-projects, the use of tiering has been approved. *See e.g. Ctr. for Biological Diversity,* 563 F.3d at 474*;Wilderness Soc'y,* 603 F.Supp.2d at 61; *Coker v. Skidmore*, 744 F.Supp. 121, 123 (S.D. Miss. 1990)(*vacated on other grounds by Coker v. Skidmore*, 941 F.2d 1306 (5th Cir. 1991)).

Under the foregoing case law and CEQ regulations, the Court finds that the agencies' use of tiering in the present matter does not rise to the level of arbitrary and capricious. In the PEA, the agencies discuss their rationale for tiering their environmental review of the LSUMC and VAMC projects and the environmental review undertaken for each tier. PEA at 1-6 to 1-7. The agencies state that they selected tiering because the CEQ regulations endorse its use where, like the present case, large-scale federal programs involve a multiplicity of individual actions. PEA

at 1-6.  This eliminates repetitive reviews in subsequent NEPA analyses and promotes

consideration of cumulative environmental impacts.  *Id.*  Further, in making the determination to

tier their environmental review of the medical center projects, the agencies consulted with and

received feedback from the CEQ, the federal body responsible for issuing regulations under

NEPA.  *See e.g.* FEMA AR026636, 026704, 026712 (Sept. 2008, emails sending draft PEA to

CEQ); FEMA AR030959 (Oct. 6, 2008, email noting feedback received from CEQ on the draft

PEA).

The PEA designates the first tier as a "broad review" on site selection and site

preparation.  *Id.*  It also notes that the first tier review will be used to identify specific areas that

will need further in-depth analysis once the site selection and preparation details are known.  *Id.*

It acknowledges that the second tier issues of construction and operation will permit and require

more detailed analysis and clarification of issues in the tier one analysis.  *Id.*  The PEA also

provides that a Tier 2 "site-specific EA will be tiered from" the Tier 1 PEA.  PEA at 1-7.  This

Tier 2 PEA will "evaluate the environmental impacts of the design, construction and operation of

the facilities."  *Id.*  The PEA also provides that additional environmental documents will be

produced regarding the final disposition of the existing VAMC and Charity Hospital.  *Id.*  This

use of tiering a more narrowly tailored EA to a previous, broader NEPA review of agency action

is warranted under the CEQ regulations.  *See* 40 C.F.R. § 1501.2.  It also complies with the "rule

of reason," by allowing the agencies to analyze information once it is available rather than

forcing them to make analyses based on speculation.  *See Miss. River Basin Alliance*, 230 F.3d at

175.  Further, by analyzing the information before them, the agencies are able to devote more

time to investigating the facts before them and conducting a more detailed analysis, than if they

were required to analyze the entire project at once despite lacking crucial information.  Finally,

given that it has been over fours years since Hurricane Katrina damaged the VA and Charity

Hospital medical facilities, the use of tiering has allowed the agencies to begin examining the

new medical center projects at an early stage as mandated by NEPA regulations and it has

allowed for a more expedient assessment.  Had the agencies been required to wait for all relevant

information to surface, the PEA would not have begun until recently, thus further delaying the

return of medical services to the New Orleans area.

Plaintiff claims that the tiered analysis is unlawful because it allows the agencies to make

an irretrievable commitment of resources and permits surface disturbance before consideration of

reasonable alternatives.  However, the record evidence shows that FEMA only recently was

directed to issue a grant of Public Assistance funds for the LSUMC, no relocations or demolition

have occurred, and only four titles out of 194 parcels on the new VAMC site have been acquired.

These developments do not rise to the level of irretrievable commitment of resources and surface

disturbance recognized under the jurisprudence.  *U.S. v. 162.50 Acres of Land*, 567 F.Supp.987

(D.C. Miss. 1983)(*remanded,* 639 F.2d 299 (5th Cir. 1983))("[n]o irretrievable commitment of

resources has been established-there is no evidence of preliminary construction on the recreation

area, and the taking of title has been declared an 'environmentally neutral' act").

The case relied upon by the Plaintiff in support of its argument, *'Illio'Ulaokalani*

*Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), is distinguishable from the present matter.

*'Illio'Ulaokalani* involved "a binding site-specific decision at the [tier 1] programmatic stage

*without analysis*, deferring consideration of site-specific issues to a [tier 2] SEIS," and the failure

of the agency to consider reasonable alternatives in *both* tiers of analysis.  *Id.* at 1097-1102

(emphasis added).  In the present matter, the Tier 1 PEA contains an analysis of site selection,

title search, acquisition of properties, transfer of titles, staging of site preparation, use of

properties, slab removal, site excavation and grading, contamination, off-site utility infrastructure, and removal of improvements and pavements, PEA at 1-6 to 1-7.  It also considered these site-specific issues for the following alternatives: no action, Mid-City site, Lindy Boggs site, Oschner site, and renovation of existing Charity Hospital.  PEA at 2-3 to 2-10. *'Illio'Ulaokalani* provides support to the Defendants' position that their use of tiering was lawful.  For example, *Illio'Ulaokalani* states that an agency is required to examine alternatives in either the tier 1 NEPA assessment or the tier 2 NEPA assessment, but not both.  464 F.3d at 1097.  The agencies in the present matter have already examined alternatives in the Tier 1 PEA as discussed above.  *Illio'Ulaokalani* also provides that a "programmatic [NEPA assessment] must provide 'sufficient detail to foster informed decision-making,' but an agency need not fully evaluate site-specific impacts 'until a critical decision has been made to act on site development.'" *Id*. at 1094.  The agencies here are in the process of evaluating site-specific impacts in their Tier II reviews now that the Mid-City site has been selected as the preferred site.

Finally, Plaintiff's reliance upon *Protect Key West, Inc. v. Cheney*, 795 F.Supp.1552 (S.D. Fla. 1992), to supports its argument that the Tier 2 EA will not cure the deficiencies of the Tier 1 PEA is inapplicable because the Court finds, as discussed above, that the Tier 1 PEA analysis is not deficient, and *Key West* is factually distinguishable from the present matter.  *Key West* held that studies, surveys, and investigations conducted after the issuance of a defective EA did not operate to cure the EA.  795 F.Supp. At 1560.  In contrast, the Tier 1 PEA here was supported by numerous studies, surveys, and investigations prior to the issuance of the FONSIs, *see* PEA at 7-4 to 7-16, and the agencies are not attempting to supplement their first PEA with mere research, but will execute Tier II EAs pursuant to NEPA.

      **d.**     **Mitigation Measures**

Page 43

Reliance upon mitigation measures may reduce a projects's impacts below the level of significance under NEPA, thus eliminating the need for an EIS. *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231(5th Cir. 2007). "[T]he Supreme Court has held that proposed mitigation measures need not be laid out to the finest detail, even within the more labor-intensive context of an environmental impact statement." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)). However, "mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS." *Id.* (citing *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d 423, 434 (5th Cir. 1985)).

Plaintiff argues that the agencies' reliance upon mitigation measures to conclude that the environmental impacts of constructing and operating the LSUMC and VAMC at the Mid-City site will not rise to a significant level, is arbitrary and capricious. Plaintiff claims that the agencies have listed mitigation measures, but have failed to provide support to show that the mitigation measures will be effective. It further claims that the mitigation measures are not supported by the record. Specifically, Plaintiff challenges the mitigation measures for five impacts: (i) drainage and flooding, (ii) land use, (iii) historic buildings, (iv) socioeconomic effects, and (v) businesses. With the applicable law in mind, the Court will address each of these challenges in turn below.

i.     *Drainage & Flooding*

The Mid-City site for the proposed LSUMC and VAMC projects is within both the FEMA 100-year and 500-year floodplain. PEA at 3-5. The PEA provides that "all new construction activities will result in adverse impacts to floodplains," PEA at 3-9, and "storm water management efforts in the surrounding areas could be adversely affected if storm water

control measures designed for the site are inadequate." *Id*. It further provides that "[p]roject planners would coordinate with FEMA as well as the local floodplain administrator regarding mitigation measures to minimize impacts due to construction." *Id*. The PEA puts forth the following mitigation measures: site design measures to allow for inadequate drainage for storm water runoff and non-storm water discharges; consultation with the New Orleans Sewerage and Water Board ("NOSWB") to determine the best way to utilize the existing drainage system; elevation of certain functions of the hospitals above the 500-year elevations; and use of an existing median for a drainage canal. *Id*. The PEA also provides that during demolition, upgrading of infrastructure, and construction, "minor temporary adverse impacts to the soils...would be anticipated." PEA at 3-8. It further provides "[g]round-disturbing activities such as grading, clearing, filling, and excavation may cause soil erosion and, subsequently, the transport of sediment via stormwater." *Id.* The following mitigation measures are put forth for erosion: procurement of a National Pollutant Discharge Elimination System Permit ("NPDES") which would include a Storm Water Pollution Prevention Plan ("SWPPP") containing site-specific best management practices ("BMP") for erosion and sediment control; BMPs such as mulching, revegetation, erosion control blankets/mats, silt fencing, fiber rolls, and other sediment control measures; and permanent landscaping vegetation and revegetation of disturbed areas. *Id*. The PEA provides that no long-term direct impacts to water resources and/or water quality are anticipated, but that during demolition and construction, a temporary disturbance to surface soils could cause short-term impacts to water sources. PEA at 3-12. It further provides that the NPDES permit and SWPPP will contain BMPs for erosion and sediment control, and that the agencies plan to work with the NOSWB to reduce impacts. *Id*.

　　　　Plaintiff argues that these mitigation measures are asserted without support or sufficient

detail, functioning as mere conclusory allegations.  Plaintiff cites *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225 (5th Cir. 2007), in support of its arguments.  *O'Reilly* involved an EA on a project that "will have substantial, long-term, adverse effects on project site soils" and which "could contribute to a possible reduction in the site's flood control functions."  *Id.* at 232.  The mitigation measures in the EA in *O'Reilly* were a "100-foot vegetated buffer zone" and "rais[ing] the elevation of the major road."  *Id.*  The Fifth Circuit held that the consideration of mitigation measures in the EA failed "to sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts so that they will not significantly affect the environment."  *Id.* at 234.

      In response, the Defendants argue that drainage and flooding impacts will occur during the construction and operation of the hospitals, not during the site selection and preparation phase, and thus will be discussed in the Tier 2 EA when construction and operation is considered.  They claim that the mitigation measures in the Tier 1 PEA were based upon the limited information available at the time.  They further claim that the alleged deficiencies in the discussion of mitigation measures will be remedied by the Tier 2 EA mitigation measures discussion.

      The Court has considered the arguments raised by the parties in their briefs and at oral argument.  It finds that the Plaintiff's challenge to the agencies discussion of mitigation measures for drainage and flooding impacts fails.  The Court finds that the agencies have lawfully utilized tiering in their environmental assessment, allowing them to consider facts, impacts, and mitigation measures for site selection and preparation in their Tier 1 PEA and later stages of design, construction, and operation in their Tier 2 EAs.  The Tier 1 PEA provides that design and construction of the facilities will have the most effect on drainage and flooding, PEA

at 3-9, thus, the Tier 2 EAs' consideration on these stages are the appropriate vehicles to discuss drainage and flooding mitigation measures.  The case relied upon by the Plaintiff, *O'Reilly*, 477 F.3d 225, is distinguishable from the present matter because it did not involve tiering, and thus the mitigation measures put forth were the final assessment put forth by the federal agency, while in the present matter mitigation information and assessment is forthcoming.

ii.    *Land Use*

The PEA provides that the existing land use at the Mid-City site will be directly impacted by the proposed medical facilities because the land use will be converted to use for medical purposes.  PEA at 3-18.  It notes, however, that the majority of the land that will be used for the medical facilities is vacant land, vacant structures, or surface parking lots.  *Id*.  It further notes that the conversion of the land use to medical use is consistent with the draft Master Plan for the Medical District.  PEA at 3-19.  The last direct impact provided is that the current residents and businesses will be displaced, an impact the PEA notes may be beneficial or adverse.  *Id.*

The PEA provides that the change in land use will likely have indirect impacts on adjacent land uses.  *Id*.  It states that the intense development and creation of jobs at the medical facilities site could reduce the total amount of land zoned for residential or commercial uses, complement the current and planned medical use in other sections of the Medical District, stimulate business in surrounding areas, and may cause a demand for residential housing in the area.  PEA at 3-19 to 3-20.

Plaintiff argues that the agencies have failed to demonstrate how mitigation measures will reduce the impact on land use to an insignificant level.  It claims that the agencies' own regulations assume that a project as large as the LSUMC and VAMC will cause significant impacts.  Plaintiff contends that instead of putting forth mitigation measures, the PEA

improperly mitigates adverse impacts by weighing them against neutral or beneficial impacts.  It last contends that the PEA provides no rational connection between the adverse impacts, change in land use, and the findings of no significant impact.

In response, the Defendants argue that although the PEA acknowledges that the medical facilities will directly impact land use, the agencies properly concluded that these impacts did not rise to the level of significance and thus they were not required to discuss land use impact mitigation measures in the PEA.  They note the basis of this conclusion was the fact that vacant land, vacant structures, and surface parking lots currently occupy the bulk of the project area and less than half of the projects's land is utilized for commercial or residential uses.  The Defendants further note that the proposed land use will be consistent with the Unified New Orleans Operating Plan for development of the city after Hurricane Katrina.  Finally, Plaintiff argues that the agencies violated their own regulations by not producing an EIS.  The Defendants respond that the regulations are not binding and the proposed projects will not conflict with local or regional zoning or land use plans.

VA regulations provide that the "[a]quisition of land in excess of 10 acres for development of a VA medical center facility," and "[p]robable conflict with, or significant effect on, local or regional zoning or comprehensive land use plans" are "[t]ypical classes of action which normally do require environmental impact statements."  38 C.F.R. § 26.2(a)(1)(ii)-(vi).  Plaintiff argues that these regulations require the VA to prepare an EIS for the proposed medical facilities projects.  However, because these regulations only list these types of actions as those that "normally" require an EIS and an agency is afforded great deference in interpreting its own regulations, Plaintiff's argument fails.  The jurisprudence provides,

[I]t is well settled that an agency's interpretation of its own regulations is entitled to

> broad deference from the courts.  Deference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress' intentions, while in the former it is addressing its own.  Thus, as the Supreme Court has explained, the agency's construction of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation.  *Cathedral Candle Co. v. U.S. Intern. Trade Com'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005)(internal citations and quotations omitted).

Similarly, the Fifth Circuit has rejected the mandatory preparation of an EIS under agency regulations where the regulations characterized the action at issue as one "Normally Requiring an EIS."  *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009).

Plaintiff's argument that FEMA violated its own regulations by not preparing an EIS also fails.  FEMA regulations provide that "[i]f an action will result in an extensive change in land use or the commitment of a large amount of land" and "[i]f an action will result in a land use change which is incompatible with the existing or planned land use of the surrounding area" are two criteria out of ten to consider in determining whether an EIS is normally required.  44 C.F.R. § 10.8(b)(2)(i)-(ii).  However, the regulations also provide "[i]n any case involving an action that normally does require an environmental impact statement, the Regional Administrator may prepare an environmental assessment to determine if an environmental impact statement is required."  44 C.F.R. § 10.8(b)(3).  The plain language coupled with the great deference afforded agencies in interpreting their own regulations results in the conclusion that FEMA did not violate the foregoing regulations, by choosing to do an EA on land use impacts rather than an EIS.

Under NEPA, when an EA finds that a project will have no significant impact, a FONSI is issued, rendering discussion of mitigation measures moot.  *See Spiller*, 352 F.2d at 241.  Plaintiff challenges the mitigation measures or lack thereof, when its argument is more properly directed at the agencies' discussion of land use impacts.  The Court considered the agencies'

discussion of land use impacts above, finding such discussion did not rise to the level of arbitrary and capricious.  Accordingly, Plaintiff's challenge to the agencies' discussion of mitigation measures is denied.

      *iii.*     *Historic Buildings*

      The PEA concludes that impacts on historic buildings will be less than significant after mitigation measures are employed.  The PEA acknowledges that the selection of the Mid-City site for the proposed medical facilities could adversely impact both individual historic properties and the Mid-City Historic District.  *See* PEA at 3-46 to 3-51.  The two sites will overlap 4.4% of the Mid-City Historic District.  PEA at 3-35.  The VAMC site will directly impact two historic buildings listed or eligible for listing on the National Register, Dixie Brewery and Pan American Life Insurance Building.  PEA at 3-37.  The LSUMC site will directly impact three buildings eligible for listing on the National Register, the Deutsches Haus, the McDonogh No.11 School building, and the Orleans House.  *Id.*

      To minimize the adverse impacts these sites will have on the Mid-City Historic District and individual historically significant buildings, the PEA puts forth the following mitigation measures.  First, the agencies would retain and reuse some structures and architectural features of other structures and assess the feasibility of avoiding or reusing others.  PEA at 5-2.  For example, the VAMC would retain and integrate the Pan-American Life Insurance Company Building and is considering doing the same for the Dixie Brewery.  *Id.*  Prior to renovation or repair, the VA will document the buildings with digital photography and put these images on the projects' website.  *Id.*  Additionally, the LSUMC will integrate or avoid the Deutsches Haus and Orleans House and will document through digital photography; in the alternative the agencies will consider relocating the buildings.  *Id.*  Second, the agencies will conduct Tier 2 EAs to

analyze the potential environmental impacts of the design, construction, and operation of the proposed medical facilities.  *Id*.  In preparation for the Tier 2 EAs, the agencies will receive public comments and convene two design review sessions.  *Id*.  Third, the agencies will conduct vibration monitoring to safeguard historic structures during the demolition and construction.  PEA at 5-3.  Fourth, the agencies will phase demolition and construction activities as necessary to minimize concentrated, indirect adverse effects on the surrounding neighborhoods.  *Id*.  Fifth, the VA and City will provide up to $800,000 for moving one-story, residential buildings of exceptional architectural importance to other areas within the Mid-City Historic District.  *Id*.  Sixth, the agencies will spend $1.4 million to apply the following mitigation measures to reduce the remaining potential adverse impacts: recordation of all properties that will not be retained, architectural salvage of important architectural elements, the creation of a public interpretation program on historic properties, assist neighborhood groups in receiving local historic district designation, reuse of Charity Hospital and the old VAMC.  PEA at 5-4 to 5-5.  The agencies also entered into a Programmatic Agreement pursuant to Section 106 of the NHPA which contains further details on measures to avoid, minimize, and mitigate the potential adverse impacts to historic buildings.  *See* PEA at 3-46.  The PEA incorporates the provisions of the PA.  *See id.*

Plaintiff argues that the PEA states, without discussion, that the impacts on historic properties will be less than significant.  It contends that VA and FEMA regulations require the preparation of an EIS for destruction of historic and cultural resources.  It notes that the PEA acknowledges that locating the medical facilities at the Mid-City site will cause adverse effects to historical properties, and argues that both the integration and the recordation followed by demolition of the National Register properties result in irreparable adverse effects.  Plaintiff finally argues that the execution of a PA does not satisfy the agencies requirements under NEPA

to take a hard look at impacts on historic properties.

In response, the Defendants argue that the agencies properly concluded that through a mitigated FONSI, no significant impact to historic buildings would occur from the construction and operation of the medical facilities at the Mid-City site.  They note that the agencies coordinated extensively with one another, citizens' groups, the Advisory Council on Historic Preservation, and the Plaintiff, in reaching their decision.  The Defendants further note that the PA provides detailed information on the implementation of the mitigation measures set out in the PEA.  Finally, the Defendants note that only 4% of the Mid-City Historic District is slated for demolition.

The Court has considered the arguments raised by the parties in their briefs and at oral argument, the relevant record evidence, and the applicable law.  It finds that the agencies have not acted arbitrary and capricious in their discussion of impacts on historic properties and issuance of a mitigated FONSI.  First, Plaintiff cites the following VA and FEMA regulations in support of its argument: 38 C.F.R. § 26.6(a)(2), 40 C.F.R. § 1508.27(b), and 44 C.F.R. § 10.8(b). These are the same regulations cited by the Plaintiff in support of its argument on mitigation of impacts on land use.  For the foregoing reasons provided under the land use impact mitigation section, Plaintiff's reliance upon these regulations fails.

Second, as shown above, the PEA contains detailed descriptions of how the historic areas and individual properties will be impacted and what will be done to minimize these impacts. Additionally, it incorporates the PA mitigation measures.  Although execution of a PA is not conclusive of compliance with NEPA, "[f]ederal agencies are encouraged to coordinate compliance" with NEPA and the NHPA.  36 C.F.R. § 800.8(a)(1).  The Fifth Circuit has recognized the commonalities between and benefits of compliance with NEPA and NHPA for a

single project.  *See Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 225 (5th Cir. 2006)(finding

both NEPA and NHPA are procedural in nature and the EA/EIS process is similar to the Section

106 process).  In *Coliseum Square Ass'n v. Jackson*, 465 F.3d at 238-39, the Fifth Circuit upheld

a mitigated FONSI which relied in part upon mitigation measures contained in a Memorandum

of Agreement ("MOA") executed under the NHPA.  The court noted "the MOA's requirements

were meant to alleviate adverse impacts on historic properties...including design review of new

construction" and binding federal, state, and local agencies to its terms.  *Id*.  Here, there are

provisions in the PA regarding these same issues.  Additionally, the Fifth Circuit in the *Coliseum*

*Square* case noted that "plaintiffs assume without demonstrating that such measures of

mitigation are inherently unreliable and that an agency cannot reasonably base its decision to

forego an EIS, in part, upon [mitigation measures under NHPA]."  *Id*. at 239.  The same scenario

is applicable here.  The Court similarly finds that Plaintiff has failed to demonstrate why the

agencies cannot rely in part upon the mitigation measures in the PA for the purposes of their

PEA and mitigation FONSI given the common goals in these documents of outlining impacts on

historical properties and discussing methods to mitigate these impacts.

  iv.  *Socioeconomic Effects*

   Plaintiff next argues that the PEA fails to evaluate whether the mitigation measures for

socioeconomic impacts will actually occur and whether they will adequately address and

remediate the adverse impacts of relocation.  Plaintiff contends that the only mitigation measures

put forth exclusively discuss economic effects, failing to address the impacts on community

cohesion, disrupted social networks, or the loss of affordable housing.  Plaintiff further contends

that the mitigation measures for economic effects, such as reimbursement, replacement housing

payments, and relocation assistance, lack sufficient information to show they will be effective.

In response, the Defendants argue that Plaintiff's dissatisfaction with the agencies' conclusion on socioeconomic impacts and mitigation measures does not make their assessment in the PEA arbitrary and capricious.  They further argue that Plaintiff fails to show how the socioeconomic impacts rise to the level of significance.  The Defendants note that the majority of the lots at the Mid-City site are vacant, undeveloped, or abandoned, thus only 0.25% of all post-Katrina residents in Orleans Parish will be relocated.  Furthermore, the Defendants contend the agencies considered a wide-array of mitigation measures in reaching their FONSIs and that the Plaintiff's criticism of the applicability of the mitigation measures is unwarranted given that the availability of affordable housing is expected to improve and that nearly one out of four homes could be eligible for relocation funding.

The Court has considered the arguments raised by the parties, the relevant record evidence, and the applicable law.  It finds that the agencies have not acted arbitrary and capricious in their determination that mitigation measures will reduce socioeconomic impacts to an insignificant level.  The PEA provides that locating the LSUMC and VAMC medical facilities at the Mid-City site will displace over 600 residents, causing an adverse effect on housing availability and community cohesion.  PEA at 3-68 to 3-69.  It provides the following mitigation measures to limit these impacts to an insignificant level: property value reimbursements, relocation services, moving certain homes, compensation for increased cost of renting, and providing housing of last resort when no comparable replacement housing is available within the displaced resident's financial means.  PEA at 5-9 to 5-12.  Most of these mitigation measures are based upon the legal requirements of the Uniform Relocation Act ("URA") and the Louisiana Expropriation Provisions which are discussed in detail.  PEA at 3-69, 5-9 to 5-12.

Plaintiff argues that the PEA fails to explain whether these mitigation measures will actually be employed and whether they will be effective.  However, Plaintiff fails to indicate why the URA, which applies to the acquisition of real estate and the displacement of people from homes due to the requirements of federally funded projects, 42 U.S.C. §§ 4601 *et seq.*, or the Louisiana Expropriation Provisions, which apply to property owners whose property is expropriated, La. Rev. Stat. §§ 19:1-19:15, will not apply.  Since the URA clearly addresses these issues it is reasonable to conclude that the mitigation measures will be effectively employed.

Additionally, Plaintiff's contentions that these federal and state laws will not be effective does not satisfy its burden to show the agencies have acted arbitrary and capricious in selecting the mitigation measures.  Plaintiff specifically complains that the PEA fails to compare the fair market value of the houses within the Mid-City site with the value of houses in the nearby area, it is not clear whether the housing of last resort payment will allow recipients to retain their homeowner status, and the PEA fails to state how many displaced homeowners will need the housing of last resort assistance and whether the funds for relocating homes will be sufficient.  However, the URA contains provisions addressing each of Plaintiff's arguments and the PEA contains a discussion of these provisions.  The URA provides that a "relocation assistance advisory program" will be created to provide, among other things, "current and continuing information on availability, sales prices, and rental charges of comparable replacement dwellings." 42 U.S.C. § 4625(c)(2).  It also provides that replacement housing of last resort is granted on "a case-by-case basis, for good cause" and that "no person shall be required to move from a displacement dwelling unless comparable housing is available." 49 C.F.R. § 24.404.  The URA also provides the following methods of providing comparable replacement housing: a

replacement housing payment, rehabilitation and/or additions to an existing replacement

dwelling, construction of a new replacement dwelling, provision of a direct loan, relocation and

rehabilitation of a dwelling, and purchase of a dwelling by an agency which in turn leases to

displaced person.  *Id*.  Additionally, the Fifth Circuit has upheld a federal agency's

environmental study conducted under the APA which suggested residential relocations under the

URA to remedy displacement problems.  *See Coliseum Square Ass'n v. Jackson*, 465 F.3d 215,

232-33 (5th Cir. 2006).

       Finally, Plaintiff's argument that the mitigation measures fail to address the adverse

effects on community cohesion and disrupted social networks, and the significant loss of

affordable housing does not demonstrate that the agencies have acted arbitrary and capricious.

The PEA acknowledges these impacts in detail, *see* PEA at 3-65 to 3-66, 3-69, and concludes

that these impacts do not rise to a significant level.  Plaintiff fails to clarify why these impacts

are significant other than citing to an article authored by one of its own counsel.  This is not

sufficient to overcome the deference to agency decisionmaking under the APA and NEPA.

       *v.*    *Businesses*

       Plaintiff argues that although the PEA states that locating the LSUMC and VAMC at the

Mid-City site will displace 63 businesses, the agencies failed to provide sufficient information on

these businesses and the mitigation measures which allegedly lower the impacts on businesses to

insignificant status.  It claims that seven of these businesses are considered extreme

displacements because of their size or the existence of potentially hazardous material.  It further

claims that a number of the businesses are local owner-operator businesses with one to five

employees which have not been evaluated to determine whether they can be feasibly relocated.

In response, the Defendants argue that Plaintiff fails to demonstrate how impacts on businesses

will be significant and notes that the PEA contains information showing the agencies did consider individual businesses and identified a number of mitigation measures.

The Court finds, after consideration of the parties' arguments, the relevant evidence, and the applicable law, that the agencies consideration of impacts to businesses and related mitigation measures was not arbitrary and capricious for the following reasons. The PEA contains information on the type, location, and concentration of commercial properties at the Mid-City site, PEA at 3-14, and contains maps indicating this information. PEA at 3-15 to 3-16. Additionally, the URA and state expropriation provisions discussed above apply to displacement of businesses and nonprofit organizations. PEA at 3-69, 5-9; 42 U.S.C. §§ 4601 *et seq.*

## III. CONCLUSION

The task of the Court in reviewing agency actions under NEPA is to focus on procedure and not outcome. If the procedures used are reasonably thorough, transparent and informed by community input, the agency is entitled to deference regarding the validity of their conclusions and a Court may not substitute its own views for those of the agency. Finally, with regard to the federal agencies' conclusions, although not determinative, it is noted that both the State of Louisiana and the City of New Orleans enthusiastically support the relocation of both facilities. Accordingly, for the reasons discussed above, IT IS ORDERED that,

(1) Plaintiff National Trust for Historic Preservation in the United States' Motion for Summary Judgment (Rec. Doc. No. 58) is DENIED,

(2) Defendants Department of Veterans Affairs, General Eric Shinseki in his official capacity, the Federal Emergency Management Agency, and Craig Fugate in his official capacity's Cross-Motion for Summary Judgment (Rec. Doc. No. 103) is GRANTED,

(3) Intervenor-Defendant, Louisiana Division of Administration, Office of Facility

Planning and Control's Cross-Motion for Summary Judgment (Rec. Doc. No. 97) is GRANTED, and

      (4) Intervenor-Defendant, City of New Orleans' Cross-Motion for Summary Judgment (Rec. Doc. No. 108) is GRANTED.

      New Orleans, Louisiana, this 31st  day of March , 2010.

UNITED STATES DISTRICT JUDGE

Page 58